SD:ABK
F. # 2015R00312/OCDETF #NY-NYE-721

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

CHRISTIAN DUQUE-ARISTIZABAL,
   also known as "Toy,"

██████████████████████████,

JOHN JAIRO HINCAPIE-RAMIREZ,
   also known as "El Profe,"

██████████████████████,
██████████

HENRY POVEDA,
   also known as "Calvo,"

████████
████████████
████████████████

              Defendants.

- - - - - - - - - - - - - - - - - - X

SUPERSEDING
INDICTMENT

Cr. No. 15-81 (S-1) (CBA)
(T. 18, U.S.C., §§ 982, 1956(h), and 3551 et seq.)

FILED
CLERK
2016 FEB 19 PM 3:45
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

1.     Narcotics traffickers amassed large cash proceeds from the sale of narcotics in the United States. The traffickers, or those associated with the traffickers, frequently attempted to give the impression of legitimacy to those proceeds; i.e., to "launder" them by making the proceeds appear to have been generated by a legitimate source. The

traffickers also devised various methods to remit those narcotics proceeds to suppliers of narcotics located in Colombia and other South American countries without alerting law enforcement agencies.

2. In order to accomplish this goal, narcotics traffickers frequently utilized domestic and foreign financial institutions in order to disguise narcotics proceeds as legitimate revenue and to transfer those proceeds through the international banking system to the countries where narcotics are produced.

The Black Market Peso Exchange

3. Narcotics traffickers commonly laundered narcotics proceeds by "selling" these proceeds to third parties in the United States in exchange for Colombian pesos to be paid in Colombia. This practice, known as the Black Market Peso Exchange ("BMPE"), typically involved a BMPE broker who facilitated the exchange of drug dollars for Colombian pesos. Trade-based money laundering, which involved the laundering of drug proceeds through the purchase of goods and services, was a common method used by BMPE brokers.

4. Often, a BMPE broker identified a South American importer who imported goods from places such as the United States, China, or Panama to Colombia or other South American countries. The BMPE broker offered the South American importer an opportunity to pay a debt owed to a foreign exporter at a significant discount. The South American importer then turned over the payment for the imported goods in the form of Colombian pesos to the BMPE broker. The BMPE broker then offered the Colombian pesos in South America to a drug trafficking organization ("DTO") in exchange for narcotics proceeds which were located in the United States in the form of U.S. currency.

2

5. The BMPE broker then arranged to have the narcotics proceeds picked up in the United States by a member of the BMPE broker's organization. These pick-ups frequently involved several hundred thousand dollars in narcotics proceeds.

6. Following a money pick-up, the BMPE broker arranged to forward the U.S. currency to an exporter in the United States to pay for merchandise purchased by the South American importer. This was frequently accomplished by depositing the narcotics proceeds directly into accounts held by the exporter. Frequently, these deposits were made in various geographic locations, corresponding to the location of the money pickups.

The Guangzhou Enterprise

7. Since approximately 2005, a global network of money launderers and drug trafficking organizations has worked together to advance trade-based money laundering activities in China, Colombia, the United States, Spain, Ecuador, Venezuela as well as other countries. This global network of money launderers was led by a group of Colombian nationals based in Guangzhou, China (the "Guangzhou Enterprise") who laundered money through bank accounts located in Hong Kong and China on behalf of DTOs located in Mexico and Colombia.

8. The Guangzhou Enterprise laundered billions of U.S. dollars derived from narcotics trafficking. The Guangzhou Enterprise used a network of Chinese currency exchange houses, export companies, casinos, and factories to receive drug proceeds in Asia, either by wire transfer or as bulk cash. The Guangzhou Enterprise established or used accounts in Hong Kong to receive drug proceeds from throughout the United States, Mexico, Colombia, Panama, Guatemala, Africa, Europe, Canada, and elsewhere and to forward the illicit funds to accounts in China. The funds were then withdrawn in cash or wired to other

3

Chinese accounts, where they were used to purchase products that were later shipped to Colombia and elsewhere. The Chinese-made goods were often counterfeit consumer goods that infringed on the trademarks of companies operating in the United States.

9. The Guangzhou Enterprise typically arranged to pay Colombian pesos to drug traffickers in exchange for the drug traffickers' U.S. dollars (i.e., the proceeds of drug trafficking). The Guangzhou Enterprise purchased the dollars at a heavily discounted exchange rate, which reflected the risk incurred by the money broker. The Guangzhou Enterprise then found Colombian or other South American customers—usually businesses that needed dollars to pay for imports or other foreign services—and sold the U.S. dollars to the Colombian or South American customers. The Guangzhou Enterprise negotiated a dollar-to-peso exchange rate lower than the formal currency exchange market rate, but higher than what the broker paid for the dollars from the drug trafficker on the black market. The dollars are then used to pay for goods in China, and those goods are exported to Colombia and elsewhere.

10. In addition to facilitating the transfer of money to China, the Guangzhou Enterprise also helped purchase and ship the goods from China to Colombia and elsewhere. The Guangzhou Enterprise operated storage warehouses and shipping companies in China that were used to receive and store goods for South American customers and to ship the goods via container ship to the customers. The Guangzhou Enterprise charged DTOs a "logistics fee" for coordinating the purchase and inspection of the goods. The Guangzhou Enterprise also charged customers a shipping fee per container of goods.

11. At various times relevant to this Indictment, the defendants CHRISTIAN DUQUE-ARISTIZABAL, also known as "Toy,"

███████████ JOHN JAIRO HINCAPIE-RAMIREZ, also known as "El Profe," ████████████████ ███ █ █ HENRY POVEDA, also known as "Calvo," ██ ██ ██ ██ █ ██ ████████

████████████ were members of the Guangzhou Enterprise.

<u>CONSPIRACY TO LAUNDER MONEY</u>

12. The allegations contained in paragraphs one through eleven are realleged and incorporated as if fully set forth in this paragraph.

13. On or about and between January 1, 2004 and December 31, 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CHRISTIAN DUQUE-ARISTIZABAL, also known as "Toy," ████████████████████████████, JOHN JAIRO HINCAPIE-RAMIREZ, also known as "El Profe," ████████████████ ███ █ █ HENRY POVEDA, also known as "Calvo," ████ ████ ██ ████ █ ██ ████████████████████████, together with others, did knowingly and intentionally conspire to: (i) conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions in fact involved the proceeds of specified unlawful activity, to wit: narcotics trafficking, contrary to Title 21, United States Code, Sections 841(a)(1), 846, 848, 952(a), 960(a)(1) and 963, and trafficking in counterfeit goods, contrary to Title 18, United States Code, Section 2320(a), knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, (a) with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i), and (b) knowing that the transactions were designed in whole and

5

in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); (ii) transport, transmit and transfer monetary instruments and funds from a place in the United States to and through one or more places outside the United States, to wit: Hong Kong and China, (a) with the intent to promote the carrying on of specified unlawful activity, to wit: narcotics trafficking and trafficking in counterfeit goods, contrary to Title 18, United States Code, Section 1956(a)(2)(A), and (b) knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity and that such transportation, transmission and transfer were designed in whole and in part to avoid one or more transaction reporting requirements under Federal law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(ii); and (iii) conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented to be the proceeds of specified unlawful activity and property used to conduct and facilitate specified unlawful activity, to wit: narcotics trafficking and trafficking in counterfeit goods, (a) with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(A), and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

14. The United States hereby gives notice to the defendants charged in this Indictment that, upon conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982, of all property involved in such offense, and all property traceable to such property, including but not limited to, at least approximately a sum of money equal to $5 billion in United States currency.

15. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

  (a) cannot be located upon the exercise of due diligence;

  (b) has been transferred or sold to, or deposited with, a third party;

  (c) has been placed beyond the jurisdiction of the court;

  (d) has been substantially diminished in value; or

  (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982, to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 982)

A TRUE BILL

_____
FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2015R00312
FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*CHRISTIAN DUQUE-ARISTIZABAL, et al.,*

Defendants.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 982, 1956(h), and 3551 et seq.)

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

*Ameet B. Kabrawala, Assistant U.S. Attorney, (718) 254-6001*